This video was made in Cooperation with the U.S. Department of State.  Good morning, Your Honors. I am Assistant United States Attorney Victor Rogers, appearing on behalf of the plaintiff, United States of America, in this case. May it please the Court, with respect to the government's appeal of the district court's ruling granting summary judgment against it, it is the government's contention that this appeal turns primarily upon two issues. The first issue is whether the district court erred when it ruled that the Supreme Court's decision in Nieder, which held that materiality of falsehood was a required element of the Federal bank, wire, and mail fraud statutes, implicitly overruled case law holding that pure conduct, unadorned by any misrepresentations and omissions, could constitute a scheme to defraud under the bank fraud statute. That's issue number one. The second issue is, assuming that this Court disagrees with the government's position as to the breadth of the Nieder opinion, did the lower court err in determining as a matter of law there was a lack of materiality with respect to the activities of Antonio Medina in connection with his attempt to multiply an initial $739,000 deposit at Bank of America when he instructed that bank to wire transfer the money overseas to an account in the name of his alias, Tony Anderson, in Spain, while also attempting to pass checks locally for the same funds? You know, I don't really understand how that theory, the duplication of such a large sum of money, would, is even really viable. I, I, I even, when you go to cash a check from out of state or a check for a large sum, isn't there always a 10-day hold? Not necessarily. And that is the advantage of check-kiting or the business of, the individuals who are in the business of check-kiting. The way they work it is they somehow persuade a bank to give them immediate credit. I would never believe that a bank would not, would allow this to occur. But it has occurred. And as an example, I would refer the panel to the earlier Medina decision, the First Bank, which was written in Spanish, and in its native language, Spanish, it was a check for $365. Somehow, he persuaded First Bank of Boston to give him immediate credit in the sum of $365,000, and he, because there were difficulties in various processing departments within the bank, he wire-transferred that money to England. That was an actual bank fraud case. This is an attempted bank fraud case in our particular instance. I would never believe that that type of scheme would ever be successful. But when you look at the various check-kiting schemes in the cases that we've cited, that is what happens. And how did you, the government started with one theory, and that was actually under a different U.S. attorney, and then we end up with this different theory under this new U.S. attorney. And I'm just wondering, how did all, how did, why are we changing the theories here? I can explain that very, very quickly. The initial complaint was filed in February 2001 based upon the identity wire and mail fraud theory, the money being the proceeds of the identity mail and wire fraud. And in connection with the motion to dismiss that complaint under Rule 12b-6, the other side argued, well, this money can't be proceeds of anything. Therefore, there is no basis for forfeiture money, forfeit the money under the forfeiture statute. In opposition to that, the government indicated, okay, there's this bank fraud theory, where we believe that Antonio Medina, by attempting to cash the check at Downey Savings on July 1, 2000, without first canceling the instructions that he gave to the Costa Mesa Branch of Bank of America, was attempting to double his money. That attempted bank fraud theory under 18 U.S.C. 1344 renders the property subject to forfeiture, even in the absence of any 1956 A2A. As long as Antonio Medina attempted to wire transfer the money overseas in furtherance of a bank fraud, that alone renders the money subject to forfeiture. Well, counsel, this is all speculation on your part, it seems to me. He hadn't been able to get anybody to transfer the funds overseas, so he decides to move it to another bank. I'm sorry. There's no suggestion that he wouldn't have canceled the order to the Bank of America if he'd been successful in depositing it at Downey Bank, or, contrary wise, if the other bank had been willing to transfer it to Spain. I mean you're In connection with this case, Your Honor, it is true with respect to the bank fraud theory. The government has the burden of proving every element of that theory, and the element is a question of intent, which I think Your Honor's question poses. What evidence does the government have that Antonio Medina was intending to multiply this deposit? And the evidence that I would point to, the first answer I would give to that question is, to the extent Antonio Medina had moved for summary judgment on the grounds that there was no evidence of intent, the government would have offered that evidence. The other evidence we would have offered is, let's look at his prior conduct. It is so simple. It would have been so simple for him to go Now, should we look at his prior conduct? With respect to Sanwa and Life Bank, yes, we should, on the question of intent. The Life and Sanwa evidence, and I'm not referring now to the 1994 conviction. I'm talking about the – I'm leaving that aside. That evidence shows that with respect to Antonio Medina, he realizes that it's critical not to disclose his true identity in the United States as Tony Anderson, because he goes to those other banks. And it's a little complicated, but he goes to those other banks. With respect to Life, he tells them he's Anthony Port. With respect to Sanwa Bank, he tells the bank that he is Antonio Medina with his Spanish passport rather than his United States passport in the name Tony Anderson. Now, if all he wanted to do was withdraw the funds by check, Antonio Medina should have – could have walked in to the opening Costa Mesa branch of Bank of America with the check payable for $738,000 and said, when his sister was sitting with him in the room, please cash this check. Please cash this check and give the money to Angeles Medina. He doesn't do that on June 16, 2000, notwithstanding the fact he has difficulty dealing with Sanwa and Life Bank during the four weeks prior to that time. Instead of doing that with Bank of America, he fraudulently conceals from the opening Costa Mesa branch of Bank of America that he's trying to send the money – he's trying to withdraw the funds by check, first on June 30th at the Huntington Beach branch of Bank of America, and then on July 1, 2000 at a different bank altogether. And also remember that when he is arrested on July 1, 2000, he is carrying three additional checks, all in the sum of $739,000, which indicates, and is pertinent to the question of the intent issue, that he intends to present those bank – those bank checks to Sanwa and Life Bank. Now, the question is, how does he do that, and how does he do it in such a way that he doesn't have to multiply his initial deposit? It is part and parcel of the entire scheme. It is the government's position that he holds that bank – that if he timed things correctly, Bank of America would send that same money in several different directions. And that – therein lies the rub. Being a layperson, it's hard to understand how a bank could allow that type of processing error to occur. But you would have to prove that. We would have to prove that. That is correct. If you prevail – I mean, the district court decided this on a very narrow issue, that there had to be a misrepresentation of fact, i.e., a statement, and or neither, for this case to go forward. And there was no particular fact, a misstatement. So you were – you are relying on the Woods case, that there is an – there's a fraudulent scheme. That is correct. I was going to mention the Woods case. That's absolutely correct. Neither did not relate to the specificity of the misrepresentations. It related to the materiality of the misrepresentations. And when the district court concluded that the specific fraudulent fact or a specific discrete omission was required, that that is not the requirement under neither, based upon this Circuit's recent opinion of Woods as well. The district court also indicated, and that is the basis for our argument, that neither – neither did not impact in any way conduct alone schemes to defraud. We've already indicated in our briefs that the entire purpose of enacting Section 1344, based upon Congress's intent, was to criminalize check-kiting schemes, mere misconduct. And that was because in 1982, the Supreme Court in Williams made check-kiting essentially unusable for check-kiting for under 1014, which prohibits the making of a false statement to the bank. In Williams, the Court held that the presentation of a worthless check could not be considered as a statement to be true or false. So, therefore, under 1014, presentment of a false check wouldn't be actionable and check-kiting wouldn't be actionable. As a result of that fact, Congress enacted 1344, as we've indicated, to – to criminalize check-kiting. And at its core, neither of you – Kennedy. What do you – what do you describe as check-kiting? Check-kiting can be a situation where sometimes it involves two banks, but it doesn't necessarily involve two banks, where an individual creates an artificially high balance in his or her account to make it appear as though funds which are there are not, in fact, there. In order to keep the scheme afloat, an individual keeps having – keeps – must to make that artificially high balance appear on the books. We've cited cases, for example, where a party goes out, sends a check, has a check for $27,000, buys stock with that $27,000 check, $27,000 check on Bank Account 1. Before that check is presented for payment, the individual uses Bank Account 2 to write a check and deposit that check drawn on Bank Account 2 into Bank Account 1 for $27,000. Okay. How does that apply to this case? It applies in this case because we have a scheme that is akin to check-kiting. The deceptive features of the scheme are akin to check-kiting. He tries to maintain an artificially – and remember, this is an attempted bank fraud case as opposed to an attempted check-kiting case, which is a little different. Check-kiting often deals with a completed bank fraud case. In this case, he tries to, assuming he is successful, maintain an artificially high balance in Bank Account of Bank of America. Well, that wasn't artificial. He had the money. He put it there. Yeah. Well, yeah, and that's why I'm trying to make a distinction between attempted check-kiting and actual check-kiting. That's the problem of the government, I think, in this case. The guy had the money. He put it in the bank, and nobody would transfer it for him. I have two answers to that. He doesn't really have the money. The money is Angeles Medina's money. But leaving that issue aside for a moment, if this had been a successful bank fraud scheme as opposed to an attempted bank fraud scheme, then the money gets transferred to Tony Anderson in Spain, which is an account under his control. Once that happens, the money is no longer in the account. Now, when he presents the checks on June 30th and on July 1, and if he somehow persuades Downey Savings on July 1 to process that check, because Downey Savings believes that there's sufficient money in the account because Bank of America's controls are not sufficient, then he does create an artificial balance. And the difficulty in connection with that is understanding the distinction between attempted bank fraud or attempted check hiding and successful check hiding. Wouldn't the facts support that when he went to the Downey Bank to deposit the check, he knew that Bank of America was not going to transfer the funds? The facts that we have are his own declaration. In paragraph 16 of his declaration and in the district court's order referring to that paragraph, Mr. Medina continued to pressure the bank to wire the funds in accordance with his instructions. But they wouldn't do it, and he knew they wouldn't. But that's a question of intent, whether or not we, the government can show that at the time of the scheme, at the time that he tried to present the check on July 1, 2000, that he, in fact, was hoping that if he timed things correctly, the bank would, in fact, transfer the funds. Did he press them to transfer it by wire after he had deposited it? Yes. That's – if you look at the district court order, and if you look at paragraph 16 of his declaration, which is on specifically GER 40, that's his declaration, and GER 426, which might be more pertinent as a district court summary judgment order, in which the district court, relying upon Antonio Medina's declaration, in which he stated, meanwhile, we continue to attempt to ascertain why Bank of America had failed to transfer the funds and implored the bank to do so. It is our position that as of that time, he continued to, and he desired that, Bank of America would send the funds in multiple directions. I'll also point to the letter of June 26, 2000, which the government cited in its brief of Angeles Medina, in which the bank indicates – sorry, the Angeles Medina indicated in the letter that Bank of America told her that the transfer would take place when the verification of her identity was completed for on July 3, 2000, whichever comes first. He presented the check on July 1, 2000. That's another statement which shows that it was ongoing as far as the government is concerned. And finally, GER 53, Bank of America's letter July 3, 2000, indicating that it was still attempting to obtain verification information as of that date. Again, that July 3 date is after July 1, when he presented the check at Downey. So it's our position, and obviously the government is going to have to prove at trial, that as of the time he cashed the – he attempted to cash these checks, he had the requisite intent. That is going to be the government's burden, obviously, at trial, assuming, of course, the case gets remanded. But with respect to the summary judgment motion, that issue was not really raised or perspectived at the time. The Court held specifically, in addition to the Nieder conclusion, that there had – there was no showing of materiality made by the government in connection with all the various representations and omissions and conduct which formed the basis of the scheme to defraud. Now, with respect to the Nieder opinion, I think it's clear that Nieder does not expect check-kiting schemes, since Congress made clear, and Nieder is a statutory construction case, which indicates that determining Congress's intent is paramount. I think it's clear that Nieder does not mandate that check-kiting schemes are no longer actionable, since it's a statutory construction case, Congress's intent is paramount under Nieder, and Congress has expressed its intent in 1344-1 to criminalize check-kiting schemes. But going on to the next issue now with respect to materiality, and with respect to this issue, just to place the matter in context, that issue is not raised. It is not raised in the moving papers, the question of materiality. It is not raised in the government's initial opposition. It's not raised in Antonio Medina's reply papers. It's not raised at the hearing on the motion for summary judgment. The only issue that's raised as of this time is a question of whether specific representations or omissions are required to make out a claim. After the government, after the Court on June 27, 2002, issues a minute order adopting Antonio Medina's view of the breadth of the Nieder case, the government's order to file a brief. In response to that, Antonio Medina files a brief and for the first time raises the materiality issue. The reason that is important is in connection with raising that materiality issue, no evidence is offered that any of the government's assertions are not material. As the Court knows, in order to move for summary judgment on the grounds that the plaintiff cannot establish an element of its cause of action, the movement bears the burden, the initial burden of production of evidence on that point and the ultimate burden of persuasion on a summary judgment motion. But no evidence of any kind was offered. With respect, and the government in its initial post-June 27, 2002, minute order simply laid out the representations and the omissions as opposed to the mere conduct, because the Court in the June 27, 2002, minute order indicated that representations or specific discrete omissions were required. So the materiality issue does not come up until very late in the day. And no evidence is offered to show that these, that the information the government's relying upon is not material. The government, even so, the record is replete with a number of items which can be concluded to be material under the objective standard of material, materiality announced in the Nieder case, which relied upon the restatement definition, or the subjective definition of materiality set forth in the alternate definition of materiality discussed in Nieder. We discussed the June 16, 2000 meeting during which Angelis and Antonio Medina were present under common law theories of fraud. That there was fraudulent concealment because Antonio Medina did not disclose his dual identity. And what is the need? Kagan. Well, he had to because he presented himself essentially by making a representation that I am not Tony Anderson. He presents you. But he didn't say that. Well, by presenting his Cal, his Spanish passport in the name of Antonio Medina instead of his United States passport in the name of Tony Anderson, it's our, it's the government's position that that was tantamount to an affirmative misrepresentation. But if the Court does not agree with that, look at it as a fraudulent failure to disclose important information. What is the definition of materiality? Materiality can be determined objectively. And it can be determined objectively and shown if a reasonably prudent bank would consider the information or the information had the capability of influencing one or more actions of a reasonably prudent bank. It is our position that that is not a very high standard. Armed with the information on June 16, 2000, that all parties to this contemplated wire transfer were actually sitting together in the room, could that influence did it have the capability of influencing one or more actions of a reasonably prudent bank? Would it be illegal for Medina to wire, he has funds in the bank, legitimate funds in the bank. Is it illegal for him to wire the funds abroad first to himself in his own name? No, is it? It is not. If it is, if the money is legitimately Antonio Medina's, it would not be illegal for him to wire the funds abroad to an account in his own name. Would it be illegal for him to wire it to himself under another name, an alias? It would only be illegal if it was part of a, some type of a scheme to defraud. If, if the only activities are whether or not he has to disclose his identity in those circumstances, my initial response would be, I do not believe that he would have to under those circumstances. But if he tried to multiply his deposit, then I think he would have to begin disclosing information. And in the context of this case, where we had prior banks who had difficulty and were unwilling to send the wire to Tony Anderson in Spain, in part because of the question of the identity of its depositor, Antonio Medina, then in that circumstance, it is material. At a minimum, a triable issue of fact is presented as to materiality. Well, what, what bothers me is that Medina went to each of these banks trying to deposit legitimate funds, as far as we know, trying to get him to wire it abroad. There was no indication that any of these other banks that he was trying, a scheme of, of trying to cash some other, in some other bank, went to one after another, after another, they wouldn't wire it. So when he goes to Bank of America, they wouldn't wire it. And now he makes a deposit to the Downey Bank. I have a hard time seeing what's criminal so far. Here, here is the evidence with respect to the additional banks. Just so the record is clear, the government did contend that Antonio Medina, who went with the Life Bank and to Sanwa Bank, was in fact attempting to double his money at Sanwa Bank. The government, the court below indicated that the government could not rely upon that evidence because the government did not allege a scheme to defraud Sanwa Bank in the same manner that he did with respect to the other banks. So there is evidence, we believe, with respect to Sanwa. He opens the account on June 5. Then he goes to another branch of the Sanwa Bank on June 15, presents a check for the same firm. After, after they wouldn't wire it. After they would not give him immediate credit and wire the funds. But the question becomes whether or not. If he had done that, that would have been the end of the story, is that not? It would have been the end of the story, assuming that he did not cash the checks. If they had wired the funds and he did not take the next step of attempting to draw on those same funds that were wired. But recall this is an attempted bank fraud case. And you have to look at it in that context. No one was successful here. And that's why it's a little odd to look at the facts and say, how could he have possibly succeeded in connection with this scheme? I then go back to my assertion that I can't believe any of these schemes work. But they do. And the only reason, as far as the government is concerned, that this scheme was unsuccessful was because he was apprehended midstream on July 1. Otherwise, we believe that the scheme would have been successful. But those are all issues that the government bears the burden of proof on and would have to persuade the trial, the fact finder at trial, that Medina possessed the requisite intent. Here we're dealing with the question of materiality. And what does materiality mean, objectively? It means whether or not information, the omissions and the affirmative misrepresentations possess the capability of influencing one or more actions of a reasonably prudent bank. We've cited a number of cases indicating that materiality is shown as a matter of law. In the instance where somebody provides false identity information to a bank. Thank you, counsel. You're well over your time, and we know the cases that you've cited in your brief. Thank you. I think I better understand the argument. Thank you, Your Honor. Good morning, Your Honors. I'm Eric Honick. I'm here for the claimants of the Medinas, Mr. Medina and his two sons. Your Honor, I think there's a misconception by the government as to the court's holding or court's decision, the district court's decision in Nieder. The court did not require the government to provide or produce proof of an affirmative misrepresentation. The court gave the government a choice. Affirmative misrepresentation, evidence of a half-truth, or evidence of concealment of a material fact, which is the government's theory in this case. So there should be no issue of remand in this case because the government actually presented the evidence that the court required, which is the law under Woods also. But this is a criminal forfeiture case, right? No, no, no. It's a civil forfeiture. Civil? Yes. So it wouldn't necessarily go to a jury? Yes, it would. It would go to a jury. It would. And they'd have to prove this before a jury. Exactly. The government would have to prove that Mr. Medina or that the money was the proceeds of this bank fraud scheme, that the money was being sent overseas or the request was being for the money to be sent overseas in furtherance of a bank fraud scheme. Yes, it would go to the jury. Which brings me to another point, and I don't mean to jump around, but the government did not produce any evidence showing that the bank in any way would find it important as to who the recipient of the wire transfer would be. And the court found that to be significant. The government has the burden after the plaintiff, I'm sorry, after the claimant raises genuine issues and material facts, government has to come forward and show there are, I'm sorry, raises that there's no genuine issues and material facts. Government has to come forward and say there are genuine issues and material facts. And the court found that the government did not show any evidence that the Bank of America would find this fairy to identify Tony Anderson as being material. But your opposing counsel said that you did not move for summary judgment on that basis. Oh, absolutely we did. You did. We moved for summary judgment. On materiality as well as the false statement. We moved for summary judgment on the basis of, there were three counts. One was identity fraud, another was wire fraud, and the third was bank fraud. And we alleged that the government did not, could not prove its case as to any one of those three counts. The issue of the Nieder case was raised by the court after the final reply was brought up or filed. And the court said I need more, I need further briefing in this issue. I need to know whether there was a concealment of a material fact in this case or an affirmative misrepresentation. And if there was a concealment of a fact, was that fact material? And both sides got to brief it again. And the government submitted further documents. They submitted affidavits. They submitted testimony, deposition testimony in that further briefing. So there was full briefing on the issue of materiality completely. Do you think the district court's decision applying Nieder is now questionable in light of U.S. v. Woods? I think it's academic, really, because the government presented their evidence that, or their evidence, what they believe showed a concealment of a material fact. That is a conduct issue. It's not an affirmative representation issue. So you didn't answer me directly. You said that's academic. It doesn't matter. Even if Woods is the law, the correct law, which may very well be. Are you conceding that it's the correct law to be applied here? I concede it. It really doesn't matter in this case. That's what I'm saying. So we go further. You think that's sort of irrelevant because the materiality element is missing. Yeah, the materiality issue was briefed. And the conduct issue, the issue of concealment, was briefed also. And that was the evidence the government presented that they thought showed a concealment of the fact that Mr. Medina didn't identify himself as Tony Anderson. So that was all briefed. Yes. The issue of intent seems to be central here. Was that briefed below? Well, the issue of intent was raised by the government below. They said there was no intent. They said that there was intent because of these activities that Mr. Medina had at these other banks. And it goes to the issue of intent and intentional act. They actually raised it in their appellate brief also, that these previous activities showed intent. So the issue was briefed also. And I think the courts, each of the judges who raised these questions, I think hit it right on the button in this case. This is not a case where Mr. Medina had some grand scheme to defraud Bank of America. He was just trying to transfer his money overseas. And that was it. He was frustrated. He went from one bank and refused to do it. And who knows why the banks refused to do it in the first place. You know, they may have researched his name and found his previous conviction and used that against him. But they refused to do it. And he didn't try to double his money in any of these other banks. It's not alleged in the complaint that he tried to double his money in other banks. And the complaint has that doubling his money. Only against Bank of America at the very end. And the facts, and this isn't really a fact-intensive case here, Your Honor. The facts are, is that, and undisputed facts. The facts are that Mr. Medina opened the bank account with his sister at Bank of America. Got power of attorney over the account given by his sister in front of the Bank of America vice president. The Bank of America vice president says that Mr. Medina can do whatever he wants on that account. He can conduct any transaction he wants on that account as long as the money is there. And so his sister initially also requests the wire transfer. Bank of America sits on it for two weeks. Mr. Medina doesn't go and try to double his money during those two weeks. As soon as the money's available on June 22nd, Mr. Medina doesn't go and try to double his money. June 27th, he asks them again, you know, why hasn't this wire transfer been done? No answer. They wouldn't give him an answer. He doesn't try to double his money then, assuming that's what he was trying to do. Finally, after Bank of America is obviously not doing what they requested, he gets frustrated and goes to Downey and says, you know, they're not going to do what I asked them to transfer the money. I'll try another bank. The Posting Council says that after that occurred, after the deposit with Downey Bank, that he still pressed Bank of America to wire the funds. Not after he went to Downey. Because he did press Bank of America to do it. Bank of America refused to do it. They just didn't act. And at that point... In response to my question, he said no, that he pressed Bank of America to wire the... It seems like that's a pretty crucial point, that he pressed Bank of America to wire the funds after he had already deposited the check with Downey. No, no, no, no. That's absolutely not true. Because he was arrested when he went to Downey Bank. He went and tried to open an account with the check in Downey Bank. And Downey Bank... And this is important also. Downey Bank called Bank of America to find out if the funds were available. Bank of America said no, the funds were not available. And they called the police and alleged that he had alleged forgery and he was arrested for forgery, which the charges were dismissed because it wasn't true. So that also goes to show the fact that Bank of America was not going to release... or Downey was not going to cast a check if Bank of America doesn't say the money's available. You know, counsel, in answer to Chuck's question, the district court seems to say that, in fact, after the Downey savings and the arrest, the first arrest that went nowhere at Downey Savings for the forgery, that then the Medina's continued to pressure Bank of America, and they cite his own declaration. Well, that's not true. The money was... the account was closed. They closed the account on July 3rd, which was two days after his arrest, and refused to do anything with the money. It was at the request of the customs agent who was contacted based on the arrest, and they put together the affidavit. They told Bank of America to close the account, and then they put the seizure warrant together and did it. So there was nothing for him to do at that point. I don't know if that's a... the court is reading that... I'm reading straight from the district court opinion. I don't have Mr. Medina's declaration with me, but... It's important to recognize... I agree with Judge Hugg. It's important because it seems to me that Bank of America... Page 7? Page... 67 in the district court opinion. And are you looking at... I'm looking at page 7 of the opinion here. Right. You start at page 6, and you have the incident with the opening of the Downey Savings and the insufficient funds and the employee calling the police. Then you turn to page 7, and after the arrest, it says, Medina's continued to pressure Bank of America and citing the Medina-Puerta declaration at paragraph 16. Your Honor, that's what the court says. Even if that was correct, he had every right to ask them to do that, because he was arrested on an alleged forgery charge. They're still holding his money. So... But Downey had his money, and he was trying to get Bank of America to send it overseas. No, Downey never had the money. Downey never had the money. He was arrested when he was trying to open an account at Downey. So Downey... No, that's why it's an attempt to... I see. Okay, so he was attempting to open this account with this check, but still pressing, according to this opinion, still pressing Bank of America to also send the money to Spain. Sure. And he had every right to. He had every right to. He wanted the wire transfer. He didn't want to have to take $739,000 in cash. But what if Downey had actually opened the bank? What if it was an attempt? What if it was successful? What if Downey had actually opened the account, and Bank of America actually said, fine? I mean, it seemed like it was pure happenstance that they sent the letter to the wrong place, the wrong address. Downey actually, while he was there at the bank, Downey actually called Bank of America and said, are the funds available? Because we're not going to open this account unless those funds are available. Bank of America said, no, the funds are not available, implying that there's a wire transfer pending, and they're not going to open the account. So that says... And he was arrested. ...that he wasn't successful, not that he did an attempt to do it. No, no, no. It's not what it says. What it says is that the banks, factually, and this is undisputed facts, factually, the banks would never release that kind of money, release any kind of money, without going through these controls. This is not an issue of an attempt, because this is actually what happens. The banks wouldn't allow it to happen. But that's what I think. I mean, that's how I came into this case, saying, what kind of a scheme could this be? Why would a bank ever release? I mean, I can't even get money that my grandmother sends me, you know, in small sums from Florida, released without a 10-day hold. So I'm thinking, why would this ever happen? But... It would never happen. But it does happen, right? Some of these schemes do succeed. In the check-hiding situation, possibly, but this is not a check-hiding situation. This is actual, verifiable money that's deposited in the account. It was a cashier's check deposited in the account. Now, it's not a case where... Check-hiding is where you deposit some money in the account, and then you write a check on that account, open another account with it, write another check on that account, which is all of that same amount of money, and open another account in there. And so now you've got the original amount of money, which is very low, and you've made it two or three times that amount of money, when the money never existed in the first place, that extra money. And this is nothing like that, because he's asked them to wire transfer his money. That's all he wanted to do. The evidence is, it's undisputed that he went to these other banks, asked them just to do that. It wasn't any scheme to defraud any bank, specifically to get them to wire the money, and then cash a check. So, in this case, if you look at the facts, and the facts are the record here, and whatever, you know, I know the government raises, well, it doesn't matter whether it was possible or not, but it's not an issue of whether it was possible or not, because the facts show the banks actually went through the process of these checks in this case. And Mr. Medina was all along aware of that, because the banks, in each case, refused, you know, did not credit the accounts immediately. They put holds on the accounts. He knew that the banks were going through all these processes. So it's not a question of whether, you know, whether it was possible it could happen. It just wasn't going to happen because of the facts in this case. It's clear that it wasn't happening. Bank of America put a hold on it. He knew Bank of America had a hold on it. The money wasn't available. He was told the money wasn't available. There was a hold on it. So he knew all that all along. So it's not like he could suddenly, that he thought that it's possible to fool the bank, because he knows the evidence was that he couldn't. Even if he had that in mind, he couldn't, because the banks had put holds on it, and they were calling each other. I don't know where the government gets its speculation. As Judge Fletcher brought up, the speculation that Mr. Medina might have been able to come up with this theory or had this theory in mind, because there's just no evidence of it. It is speculation completely. And if you look at the facts in this case, there's no scheme to defraud in this case. It's just someone just trying to get his money transferred overseas. And in every instance, in every fact of every bank, that's all that he's trying to do. It's like, I don't know if the Court recalls the book and the movie Ragtime. And it was the man who the fire people put excrement in his car, and he wanted it cleaned out. That's all he wanted. He just wanted to get that done. And things just kept mushrooming and snowballing. And this is similar, and so he ended up committing a terror attack. In this case, it's the same type of situation. He just wanted to get his money transferred out of the country. If it had happened, as Judge Fletcher brought up, if it had happened, we wouldn't be here. But he kept getting turned out. The government argues, why didn't he just withdraw the money, or withdraw it in cash or a certified check or a regular check, and go to Spain and put the money in the bank? The safest way, obviously, is you wire transfer the money. There's no guarantee that a bank overseas is going to honor a check and honor it right away. It could take weeks, months, whatever. You don't carry $739,000 in cash overseas. And why the whole amount? Why not part of the amount? I don't know. Maybe a bank, if the bank thought it was better for him to transfer it in pieces, then they would have suggested it. I mean, the bank just refused to transfer the money, period. All the banks refused to transfer the money, period. If they thought that the money should be done in $100,000 increments, then, you know, the banks got the money. They know what they can do and what they can't do. So there's just no reason for him to say, well, I want less of the money transferred, unless the bank suggested it's more viable that way. And they carry $700,000 and some $1,000 in cash overseas. I mean, that's just ripe for theft and whatever else, and you lose all that kind of money. Everyone knows, I think the Court would recognize that a simple wire transfer, verifying that the money is in the bank, going to the other bank directly that day or within a couple of days, is very safe and that money is available right away. And rather than carrying a check, even. I mean, a check can be stolen or lost. You know, a cashier's check. So a wire transfer is as safe as the cleanest way. You know, after the fact, the government was saying, well, he could have done this, he could have done that, but that's not what they were looking for. They were looking for a quick, safe method of transfer. Is the major thing that the government is really objection to is not canceling the request with Bank of America to wire the – not canceling that instruction? Well, not in the complaint. The complaint doesn't even talk about that. What the complaint says is that he didn't identify himself as Tony Anderson as being the recipient – he himself as being the recipient of the wire transfer. This rescission of – or not rescinding the wire transfer request is not even an issue in the complaint. It's brought up after the fact in argument. And it never was what the government was alleging, which brings us back to this case. It's not a case – it's never a case of bank fraud. It was always a case of allegedly he used a false Social Security number in opening a bank account. And the government persisted with that theory up through summary judgment, which wasn't even true. The customs agent never even bothered to verify that it was in fact his Social Security card. So it's as if this case – the government just wants to take this money. They're saying he tried to steal the money. The government's trying to steal his money in this case by coming up with a theory after the fact 15 months later saying, well, you know, we were wrong. We didn't tell the truth about how he used a Social Security card. So we'll come up with another theory in this case and try to see if we can get the money this way. And if you look at the facts, it's exactly how they play out in this case. They're just grasping at straws trying to find a way to take the money. I have no other points unless the Court does. I think time's run out. Thank you, Your Honor. Thank you very much, counsel. A minute? Just a minute. Just to clarify a few misstatements that Mr. Medina's counsel just made. In the first admitted complaint, the government did allege, as reflected on GER 415, that Antonio Medina attempted to cash the check on July 21, 2000 at Dowdy without rescinding the instructions, close quote, he had given to the prior bank. So that is in the complaint. With respect to the timing of when the government first conceived of this theory, we made it very clear that the theory was first conceived of in opposition to the motion to dismiss 12b-6, the complaint. That was filed even before Medina filed an answer to the complaint. So it's completely untrue to say that this theory was first conceived of 15 months after the filing of the complaint. The theory was disclosed 2 months after the complaint was filed. So it's a complete misstatement with respect to the record. In connection with the contention that summary judgment was moved on the summary judgment was based upon a lack of showing of intent to defraud. Antonio Medina never argued in his papers that the government had not established the element of a bank fraud scheme requiring, quote, an intent to defraud. It's not there. It wasn't part of his moving papers. It wasn't part of any portion of this case. The issue of the materiality, the lack of any declaration from Bank of America to indicate that Bank of America cared with respect to who Antonio Medina was, as we've indicated and as Nieder teaches, the subjective materiality of the victim is irrelevant. Subjective materiality is not a component of a scheme to defraud based upon Nieder because the scheme to defraud statute protects incomplete frauds as well as complete frauds. The question of actual reliance, what impact it might have had on the bank, is not pertinent. But I would also add that with respect to Bank of America, we did offer evidence that Bank of America considered the true identity of Tony Anderson important because we offered evidence that a bank investigator, a fraud investigator, spoke with Angeles Medina and asked her, Ms. Medina, do you know that your brother uses the alias Tony Anderson? And she said no. This was the individual, Tony Anderson, whose name was on Angeles Medina's written June 16, 2000 instructions advising Bank of America to wire transfer the money to Tony Anderson. So subjectively, there is evidence that Bank of America cared. No evidence, again, since the moving party bears the burden of proof of showing the absence of evidence on a particular element of a cause of action, they offered no evidence on that point. That is required to meet the initial burden of production on a summary judgment motion. If a party fails to meet that burden, the opponent doesn't even have to reply. And lastly, there is a law to do that. Kennedy, I understand that in earlier statements that you made, because it's attempted bank fraud, that materiality makes no difference at all? It can be a completely immaterial statement? No, absolutely. If I said that, I did not mean to say that. I meant to say that materiality is determined objectively based upon a reasonable person standard, not based upon the subject, whether or not the recipient would consider the matter important, based upon the neater decision, which held that actual reliance is relevant. So it would be important what the bank, what would likely have been a reasonable consideration by the bank. By a reasonable bank in that position, that's absolutely correct. And finally, there was all this discussion about Antonio Medina knowing that Bank of America had closed the account as of July 3, 2000. There's no evidence of that in the record. In fact, he didn't find out. He testified that he didn't know about this until September of 2000, when the money was seized. That was the first time he even found out that Bank of America sent the July 3, 2000 letter to Angeles Medina that was returned to the bank. Antonio Medina did not even know about that in September of 2000. So for Antonio Medina to represent that as of July 1, 2000, he knew the bank account had been closed is completely false. But remember that the issue on summary judgment was materiality. Whether or not any of the omissions could affect any action or possess the capability of affecting any action of the opening Costa Mesa branch of Bank of America, viewing that under a reasonable person standard. I would submit, Your Honor, the question of whether or not tribal issues affected this on that issue has to be out of the affirmative. Thank you very much, Counsel. U.S. v. Medina is submitted. And the last case for today, an LRB v. Michael's Painting has also been submitted. So we will adjourn for the day. Thank you. All rise. This Court for discussion stands adjourned. Thank you. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor.
judges: Hug, Farris, Wardlaw